IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**KAYLOR McINTYRE**                                                                       **PLAINTIFF**
**ADC #166592**

v.                                          No: 4:21-cv-00110 JM-PSH

**DEXTER PAYNE,** *et al.*                                                        **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following proposed Recommendation has been sent to United States District Judge James M. Moody, Jr. You may file written objections to all or part of this recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this recommendation. By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

Plaintiff Kaylor McIntyre, an inmate at the Cummins Unit of the Arkansas Division of Correction (ADC), filed a complaint pursuant to 42 U.S.C. § 1983 on February 8, 2021 (Doc. No. 2).[1] He subsequently filed an amended complaint (Doc.

---

[1] McIntyre was incarcerated at the ADC's Barbara Ester Unit when he filed his complaint, but has since been transferred to the Cummins Unit. *See* Doc. Nos. 2 & 21.

No. 4). McIntyre states that on November 8, 2020, he noticed raw sewage overflowing from the toilets and the showers from several of the bottom cells in the barracks at the Barbara Ester Unit (the "Unit"). Doc. No. 4 at 4. He alleges that the sewage problem was not fixed until November 13, 2020. *Id.* He further alleges that the barracks were not cleaned and sanitized until November 20, 2020; and he was forced to live in an unsanitary environment during that time. *Id.* at 5. According to the complaint, there was no effort made to properly sanitize the barracks in a timely manner after the drains were unclogged. *Id.* McIntyre therefore asserts that the ADC's failure to sanitize the barracks violates his constitutional rights. *Id.* at 5. He sues ADC Director Dexter Payne, Warden Gary Musselwhite, Deputy Warden Michelle Gray, and Corporal Sandra Gracie in their official and personal capacities for declaratory and compensatory relief. *Id.* at 5-7. McIntyre's claims against Payne were previously dismissed without prejudice (Doc. No. 47). His claims against Musselwhite, Gray, and Gracie (the "Defendants") remain.

The Defendants filed a motion for summary judgment, a brief in support, and a statement of facts (Doc. Nos. 48-50). Although notified of his opportunity to do so (Doc. No. 51), McIntyre did not file a response or separate statement of disputed facts. Accordingly, the Defendants' motion to deem their statement of undisputed material facts, Doc. No. 52, should be granted and their statement of facts deemed admitted. *See* Local Rule 56.1(c). The Defendants' statement of facts, and the other

pleadings and exhibits in the record, establish that they are entitled to judgment as a matter of law and their motion for summary judgment should be granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, and must instead demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or

undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III. Facts

The following material facts are taken from the Defendants' statement of facts, which are deemed admitted, and other evidence in the record.

1. McIntyre was housed in the Unit's 1-C barracks during the time period relevant to his complaint allegations: November 8 through November 20, 2020. Doc. No. 48-1, *Deposition Testimony of Kaylor H. McIntyre* ("*McIntyre Deposition*") at 12:8-10.[2]

2. On November 5, 2020, the Unit began a COVID-19 lockdown due to an outbreak of the virus, according to defendant Michelle Gray who served as Deputy Warden of the Unit at that time. Doc. No. 48-7, *Declaration of Michelle Gray* ("*Gray Declaration*"), at ¶ 5. While on lockdown, inmates were to remain in their barracks to avoid spreading the COVID-19 virus. *Id.* at ¶ 6. This was to ensure that inmates who were COVID-19 positive—or inmates who had been exposed to someone who was COVID-19 positive—did not expose or infect other inmates or ADC staff. *Id.* at ¶ 7. By implementing lockdown, the Unit could restrict any interaction between a barracks with positive inmates and those with negative inmates. *Id.* at ¶ 8. Out of an abundance of caution, barracks would also be quarantined if an inmate housed there had a pending COVID-19 test result. *Id.* at ¶ 9.

3. As a part of this unit-wide lockdown, 1 and 6 barracks were placed on total lockdown, according to both Gray and defendant Corporal Sandra Gracie, who

---

[2] Deposition page numbers refer to the page of the deposition, not the EM-ECF docket page number.

worked in maintenance and construction at the Unit in November 2020. Doc. No. 48-2, *Declaration of Sandra Gracie* ("*Gracie Declaration*"), at ¶ 7; *Gray Declaration* at ¶ 6.

4. On the same day that the Unit was placed on a COVID-19 lockdown, November 5, 2020, drains all over the Unit began backing up due to being clogged. This caused sewage backup and flooding in several areas, primarily in the Unit's Chapel, 1 barracks, 4 barracks, and 5 barracks. *Gracie Declaration* at ¶ 9; *Gray Declaration* at ¶ 10.

5. The Unit's maintenance department immediately began work to unstop the clogged drains on November 5, 2020, even though inmates on the primary maintenance crew housed in 6 barracks were on precautionary lockdown for COVID-19. *Gracie Declaration* at ¶ 11. *See also* Doc. No. 48-4, *November 2020 Maintenance Report* ("*Maintenance Report*"), at 2.

6. The focus on November 5, 2022, was to unstop the drains at the Chapel. The Chapel drains and 1 barracks drains are connected. Every time 1 barracks flushed its toilets, the Chapel and 1 barracks drains backed up. *Gracie Declaration* at ¶ 12; Doc. No. 48-4, *Drain Timeline* ("*Timeline*").

7. It was later determined by unit maintenance that inmates had flushed objects such as socks, razors, and even blankets inside sewage lines causing the sewage to back up, presumably out of retaliation for the Unit's COVID-19 lockdown

status. *Gracie Declaration* at ¶ 10; *Gray Declaration* at ¶ 12.

8. It is undisputed that when the drains first became clogged and began to overflow into several barracks, 1-C barracks was quarantined due to a pending COVID-19 test result in the barracks. *Gray Declaration* at ¶ 14; *McIntyre Deposition* at 13:23-14:3; 16:1-8. *See also* Doc. No. 48-9, *COVID-19 Quarantine Barracks Notification* at 2*; McIntyre Deposition* at 27:24-28:4.

9. Because all barracks surrounding 1-C, including 1-A, 1-B, and 1-D barracks, were negative barracks at that time, the inmates housed in the quarantined 1-C barracks could not be moved while waiting on the pending test result. *Gray Declaration* at ¶ 15.

10. The drainage issues at the Unit persisted into November 6, 2020, and the maintenance crew continued its work on the drain lines running from the Chapel to the 1 barracks manholes. *Gracie Declaration* at ¶ 13. *See also Timeline; Maintenance Report.*

11. On November 5 and November 6, maintenance augured pipes all day in an attempt to unstop the drains all over the Unit. *Gracie Declaration* at ¶ 14. *See also Timeline; Maintenance Report.*

12. McIntyre first noticed the sewage in 1-C barracks on November 8, 2020, according to his amended complaint and deposition testimony. Doc. No. 4; *McIntyre Deposition* at 13:16.

13. McIntyre testified that his bunk was never flooded with the raw sewage because he was housed on the top floor of 1 barracks. *McIntyre Deposition* 20:15-17. However, he explained that inmates tracked the sewage throughout the barracks because they had to walk through it to get their meal trays. *Id.* at 20:13-14. McIntyre was particularly bothered by having to eat in the unclean barracks due to the Unit's COVID-19 lockdown. *Id.* at 17:5-9.

14. On Monday, November 9, 2020, maintenance continued to augur pipes all day, and they specifically unstopped the drains in 1 barracks that were causing a backup and also unstopped the showers in 1-D barracks. *Gracie Declaration* at ¶ 15. *See also Timeline; Maintenance Report.*

15. Throughout this timeframe, Defendants and other ADC personnel kept in contact via email, providing updates multiple times a day and communicating about the most effective way to deal with the drainage issue. *Gracie Declaration* ¶ at 16; *Gray Declaration* at ¶ 16; Doc. No. 48-5, *Gracie Email November 9 – November 24, 2020* ("*Email*").

16. On November 9, 2020, although maintenance at the Unit was continuously auguring pipes and had used three bags of Green Gobbler drain cleaner, nothing was successfully unclogging the drains that were flooding several areas of the Unit. *Gracie Declaration* at ¶ 17; *Email* at 1.

17. On November 10, 2020, Gracie sent an email to Deputy Warden Gray explaining that several areas of the unit were completely stopped up, and that 1 barracks was one of the worst areas. *Gracie Declaration* ¶ 18; *Gray Declaration* ¶ 18; *Email* at 5.

18. Also on November 10, 2020, at 11:02 a.m., Gracie emailed Gray to inform her that maintenance had requested Pine Bluff Waste Water to assist in the efforts to unclog the drains with their vacuum truck, as it was clear that they needed outside assistance in their efforts. *Gracie Declaration* at ¶ 19; *Gray Declaration* at ¶ 19; *Email* at 8.

19. Later that day, according to Gracie, the Unit also contacted Roto Rooter to assist. Due to the Veterans Day holiday on November 11, Roto Rooter could not respond until the morning of November 12, 2020. *Gracie Declaration* at ¶ 20; *Gray Declaration* at ¶ 20; *Email* at 12.

20. Gracie communicated at that time that "[w]e've done all we can do without bigger equipment to push the clog out of the manhole." *Gracie Declaration* at ¶ 21; *Email* at 12.

21. Because November 11, 2020, was a state holiday there were no maintenance workers at the Ester Unit. *Gracie Declaration* at ¶ 22.

22. However, on that day Sgt. Ruby Holcomb and Lt. Evans provided 1-C and 1-D barracks with bleach, squeegees, and other cleaning supplies so that inmates

could clean their pods and the dayroom area. *Gray Declaration* at ¶¶ 21, 22; Doc. No. 48-11, *November 11, 2020 Email from Ruby Holcomb to Michelle Gray* ("*Holcomb Email*"). The stagnant water with feces in 1-C barracks was cleaned, and the shop vac was used to remove excess water in areas that did not have drains. *Id.*

23. Although McIntyre claims in his complaint that 1-C barracks were not properly sanitized until November 20, 2020 (Doc. No. 4), he conceded in his deposition testimony that 1-C inmates received cleaning supplies prior to that time. *McIntyre Deposition* at 20:1-7.

24. On November 12, 2020, Roto Rooter successfully unstopped some of the Unit's drains, but was unable to unstop them all due to the severity of the clogs. *Gracie Declaration* at ¶ 23. *See also Timeline*.

25. The next day, November 13, 2020, maintenance repaired the toilets in 8 barracks and unstopped the drains in 1 barracks and the Chapel. *Gracie Declaration* at ¶ 24. *See also Timeline*; *Maintenance Report*.

26. McIntyre confirmed in his deposition that unit maintenance fixed the drain issues in 1-C barracks on November 13, 2020.[3] *McIntyre Deposition* at 14:13-15.

---

[3] The work of unclogging the drains at other areas of the Unit continued daily until Monday, November 23, 2020, when the drains were finally all unclogged. *Gracie Declaration* at ¶ 25.

27. McIntyre agreed that unit maintenance worked to resolve the Unit's drain problem until it was ultimately fixed on November 13, 2020. *McIntyre Deposition* at 23:18-20; 24:3 7. He also testified that he believed Defendants did not purposely force him to live in unsanitary conditions, but he believed they could have worked harder to find a solution more quickly. *Id.* at 31:16-22. McIntyre additionally testified that he did not place full blame on Defendants for the alleged constitutional violation giving rise to his lawsuit, *id.* at 28:19-25, but believed the Defendants were negligent in their actions. *Id.* 25:20-23; 29:1-5; 32:6-15.

28. Although he claimed no specific injury in his amended complaint (Doc. No. 4), McIntyre testified that he became nauseous, threw up, and had headaches as a result of the unclean conditions in his barracks. *McIntyre Deposition* at 18: 7-23. He testified he sought medical treatment but was told there was no treatment for his symptoms. *Id.*

### IV. Analysis

#### A.   *Sovereign Immunity*

McIntyre's claims for money damages against the Defendants in their official capacities are barred by sovereign immunity. A suit against a state employee in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity. *Will v. Michigan Department of State Police, et al.*,

491 U.S. 58, 71 (1989); *Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989). Additionally, to the extent McIntyre seeks injunctive relief, those claims are moot because he is no longer incarcerated at the Unit. *See generally Martin v. Sargent,* 780 F.2d 1334, 1337 (8th Cir. 1985) ("[A] prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions."). Accordingly, McIntyre's official capacity claims should be dismissed.

### B.     *Qualified Immunity*

The Defendants argue that they are entitled to qualified immunity with respect to McIntyre's individual capacity claims. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To prevail on an Eighth Amendment conditions of confinement claim, a prisoner must show (1) the alleged deprivation was, "objectively, sufficiently serious," and resulted "in the denial of the minimal civilized measure of life's necessities," and (2) prison officials were deliberately indifferent to "an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 834 (1970). This standard requires more than a showing of negligence; in fact, even gross negligence is not actionable. *See Newman v. Holmes*, 122 F.3d 650, 653 (8th Cir. 1997) (". . . *Farmer* stands for the broad proposition that deliberate indifference includes something more than negligence but less than actual intent to harm."); *Sellers By & Through Sellers v. Baer,* 28 F.3d 895, 902–03 (8th Cir. 1994) ("Gross negligence on the part of the officers—even assuming their conduct rose to such a level—is not actionable under . . . § 1983.").

Additionally, the length of time a prisoner is exposed to unsanitary conditions is relevant to the Court's analysis as is the extent of the unclean conditions. *See Owens v. Scott County Jail,* 328 F.3d 1026, 1027 (8th Cir. 2003). A filthy cell may "be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney,* 437 U.S. 678, 686–87 (1978). *See also Smith v. Copeland*, 87 F.3d 265, 269

(8th Cir. 1996) (no constitutional violation where inmate subjected to an overflowed toilet in his cell for four days); *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994) (finding short period in deplorable conditions without cleaning supplies not a constitutional violation); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (relatively brief 11-day stay in allegedly unclean cell not unconstitutional, especially where inmate could have requested cleaning supplies).

In this case, McIntyre may have been exposed to sewage from overflowed drains for a period of five days (from November 8 to November 13, 2020), and was without cleaning supplies for three of those days (until November 11, 2020). Because he was upstairs, his cell was not flooded with sewage. His exposure to sewage was limited to that which was tracked throughout the barracks by guards delivering food. While not ideal, this relatively short period of time in an unclean cell with cleaning supplies made available simply does not implicate the constitution, and did not result "in the denial of the minimal civilized measure of life's necessities." *See Farmer, supra.*

Furthermore, there is no evidence that any of the Defendants were deliberately indifferent to the conditions caused by the clogged drains in McIntyre's barracks. Rather, the evidence establishes that Gracie and unit maintenance worked diligently to get the drains unclogged and sought assistance from outside the prison to get that done. She remained in contact with Deputy Warden Gray during this time period.

Even McIntyre admitted that the Unit worked to repair the clogged drains; he just believed that the Unit should have found a solution more quickly. This belief, however, fails to establish that the Defendants were deliberately indifferent to an excessive risk to inmate health or safety in the actions taken to resolve the clogged drains. He does not offer evidence that the Defendants could have repaired the problem more quickly and simply chose not to do so. The evidence also shows that the Defendants could not simply move the inmates in McIntyre's barracks to another barracks with unclogged toilets due to a pending COVID-19 test in his barracks. To do so may have put more inmates at risk of catching COVID-19.

The presence of raw sewage in the barracks is problematic. However, at worst, the actions of the Defendants could constitute negligence, which is insufficient to support a constitutional claim. Because McIntyre has not established that his constitutional rights were violated, the Defendants are entitled to qualified immunity.

### V. Conclusion

The Defendants' motion to deem their statement of facts admitted (Doc. No. 52) and their motion for summary judgment (Doc. No. 48) should be granted, and McIntyre's claims against them dismissed with prejudice.

IT IS SO RECOMMENDED this 12th day of January, 2023.

_____
UNITED STATES MAGISTRATE JUDGE